1  Brian T. Hafter (State Bar No. 173151)
   Stefani Salt (State Bar No. 280403)
2  LeClairRyan LLP
   44 Montgomery Street, Eighteenth Floor
3  San Francisco, California 94104
   Telephone:  (415) 391-7111
4  Telefax:  (415) 391-8766
   Brian.hafter@leclairryan.com
5  Stefani.salt@leclairryan.com

6  Mitchell N. Roth (pro hac vice)
   Karen A. Doner (pro hac vice)
7  Roth Doner Jackson, PLC
   8200 Greensboro Dr., Suite 820
8  McLean, VA  22102
   Phone (703) 485-3535, Fax (703) 485-3525
9  mroth@rothdonerjackson.com;
   kdoner@rothdonerjackson.com
10
   Attorneys for Defendant
11 MD247.COM, INC., a Florida corporation

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15 SUZAN MENDOZA, individually and on          Case No.: CV 13 1553 PJH
   behalf of all other similarly situated,
16                                              **DEFENDANT MD247.COM, INC.'S REPLY**
              Plaintiff(s),                     **IN SUPPORT OF ITS MOTION TO STAY**
17
         v.                                     [Honorable Phyllis J. Hamilton]
18
   UNITEDHEALTH GROUP                           Hearing Date: January 8, 2014
19 INCORPORATED, a Minnesota corporation,       Time: 2:00 p.m.
   OPTUM, INC., a Delaware corporation,         Courtroom 3, 3rd Floor
20 HEALTHHALLIES, INC., a Delaware
   corporation, and MD247.COM, INC., a          Complaint Filed: Apr. 5, 2013
21 Florida corporation

22            Defendant(s).

23

24

25

26

27

28

                                      1

## INTRODUCTION

Plaintiff alleges that calls made to her cell phone were made utilizing an automatic telephone dialing system ("ATDS"). Compl. ¶ 22, ECF No. 1. However, at the time of the alleged calls, MD247.Com ("MD247") "did not utilize any capacity that its predictive dialer may have had to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers." Decl. of Thomas Meehan in Supp. of Mot. to Stay, at ¶ 9, ECF No. 51. The question of whether the Telephone Consumer Protection Act ("TCPA") prohibits calls by any predictive dialer, or other machinery, that has the broad, *potential capacity* to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers ("Auto-dial") – or the more narrow *present capacity* to Auto-dial at the time of dialing is currently being considered by the FCC. The implication of such a determination is far-reaching:  it will determine once and for all whether companies that disengage any present capacity to Auto-dial – like MD247 – will, nonetheless, be held liable for calls to cell phones.  MD247 respectfully submits that this is an issue within the special competence of the FCC since such a ruling on the matter would, in effect, make federal policy on the liability of telemarketers utilizing predictive dialers without the present capacity to Auto-dial.  Accordingly, MD247 respectfully moves this Court to stay the action pending the FCC's determination on the definition of ATDS.

## ARGUMENT

The legal landscape surrounding the definition of ATDS and whether such definition includes machinery without the present capacity to Auto-dial is not well-settled, as Plaintiff would have this Court believe.  This Court *will* ultimately be required to adjudicate whether MD247 utilized an ATDS.  Additionally, contrary to Plaintiff's argument, determination of what constitutes an ATDS is not merely a question of statutory interpretation.  Instead, an FCC determination on the *present capacity* issue will create federal policy on whether companies that proactively disengage or otherwise remove capacities to Auto-dial will nonetheless be liable for calls to cell phones.  Because the FCC is actively taking on the issue of *present capacity* and whether the definition of ATDS requires the present or potential capacity to Auto-dial, this Court

1    should stay the action.

2    **I.    THIS MATTER SHOULD BE STAYED BECAUSE THE FCC IS *ACTIVELY***
3    **CONSIDERING THE DEFINITION OF ATDS BY CIRCULATING PETITIONS ON**
     **THE ISSUE, DRAFTING AT LEAST ONE ORDER, AND NOTICING OTHER**
4    **PETITIONS FOR PUBLIC COMMENT – ALL WITHIN THE PAST FEW MONTHS.**

5         The FCC is hardly sitting idly by on the *present capacity* issue and the definition of

6    ATDS.  Two petitions are currently being circulated among the Commissioners, with at least one

7    order expected as a result.  Furthermore, within the last six months, the FCC has sought public

8    comment on three petitions addressing the same issue.  Two of such requests for comment were

9    published under the new leadership of Chairman Thomas Wheeler.

10        **A.    There Is At Least One Order and Definitely Two Petitions for Declaratory**
          **Ruling Circulating Among the FCC Commissioners, Each of Which Address**
11        **Clarification on the Definition of ATDS and the *Present vs. Potential* Capacity Issue.**

12        The FCC publishes Items on Circulation on a weekly basis.  This list announces to the

13   public those matters for which items are being circulated among Commissioners.  The FCC

14   announced that two petitions for declaratory ruling are being circulated that seek clarification on

15   the *present capacity* issue:   Communication Innovators Petition for Declaratory Ruling

16   ("Communication Innovators Petition") and Group Me, Inc./Skype Communications S.A.R.L.

17   Petition for Expedited Declaratory Ruling ("Group Me Petition").  A true, accurate copy of the

18   FCC's List of Items on Circulation is attached hereto as **Exhibit A.**[1]  As the FCC explains, the

19   "list of FCC Items on Circulation provides a compilation of the Commission level items that

20   have been circulated and are pending action by the full Commission."  See Ex. A at 1.

21        Contrary to Plaintiff's statement that "there is no indication that the FCC intends to rule,"

22   Pl. Opp'n. at 12, ECF No. 57, on September 10 2013, the then-Acting Chairwoman Mignon L.

23   Clyburn and Acting Chief of the FCC's Consumer and Governmental Affairs Bureau ("CGB")

24   informed several U.S. Congressmen that "[a] draft order to resolve the [Communication

25   Innovators] Petition is under consideration by the Commission, and Communication Innovators

26   has met with the staff recently to discuss the matter. . . . and [the Commissioners] expect the

27   _____

28        [1] Also available at http://transition.fcc.gov/fcc-bin/circ_items.cgi (last accessed Dec. 17, 2013).

1    Commission to resolve it soon." True, accurate copies of these letters are attached hereto as

2    **Exhibit B.**[2]  This Court will note that the Communication Innovators Petition *directly* addresses

3    the previous FCC statements regarding predictive dialers and notes the Commission's previous

4    focus solely on the equipment's capacity – without addressing the equipment's actual ability to

5    Auto-dial.   Commc'n Innovators Pet'n for Decl. Ruling, FCC CG Docket No. 02-278, at 11

6    (June 7, 2012), attached hereto as **Exhibit C.**

7         Furthermore, the GroupMe Petition is also being circulated, which likewise seeks

8    clarification on the issue of *present capacity* by requesting a ruling that the term "capacity" be

9    construed narrowly so as to apply to dialing equipment's present capacity to Auto-dial.  See

10   GroupMe, Inc.'s Pet'n for Expedited Decl. Ruling and Clarification, FCC CG Docket No. 02-

11   278, at 9-16 (March 1, 2012) (attached as Ex. A to Mot. to Stay, ECF No. 50).   Despite

12   Plaintiff's efforts to paint a picture otherwise, the FCC's activity – particularly among the

13   Commissioners – demonstrates its intention is to resolve the *present capacity* issue –perhaps

14   driven by the FCC's new Chairman, Thomas Wheeler, who took office November 5, 2013.

15   Given the foregoing activity with respect to this issue alone, this Court should stay this action.

16        **B.   In the Last Six Months, the FCC Has Sought Public Comment on Three
          Petitions for Declaratory Ruling, All of Which Seek Clarification on the Definition**
17        **of ATDS and Whether the Definition of ATDS Only Includes  Equipment that has
          the Present Capacity to Store or Generate Sequential or Randomized Telephone**
18        **Numbers *at the Time of the Call*.**

19        Plaintiff suggests that "it very well could be that the FCC just isn't going to take up the

20   [*present capacity*] issue." Pl. Opp'n at 12, ECF No. 57.   Yet on June 25, 2013, the Consumer

21   and Governmental Affairs Bureau ("CGB") of the FCC (the FCC bureau under whose purview

22   this issue falls) initiated a series of active solicitations for comment on the *present capacity*

23   issue, which are described below.  Contrary to Plaintiff's assertion, the FCC has, in fact, "taken

24   up" the issue.

25        On June 25, 2013, CGB issued the following public notice: "Consumer and

26   Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling

27   _____

28        [2] Also available at http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db0927/
     DOC-323529A1.pdf (last accessed Dec. 17, 2013).

from YouMail, Inc.," a true, accurate copy of which is attached hereto as **Exhibit D**. CGB summarized YouMail, Inc.'s petition as follows:

> YouMail first asks the Commission to clarify that its . . . software is not an 'automatic telephone dialing system' (ATDS) as defined by 47 U.S.C. § 227(a)(1) because the software foes not have the **current capacity** to store, produce, or dial random or sequential telephone numbers.

Ex. D at 1 (emphasis added).

Chairman Thomas Wheeler took office on November 5, 2013. Since then, CGB issued two more public notices with respect to this issue. First, on November 19, 2013, CGB announced: "Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling and/or Rulemaking from the Professional Association for Customer Engagement," a true, accurate copy of which is attached hereto as **Exhibit E**. CGB summarized the Association's ("PACE") petition as follows:

> PACE seeks clarification through an Expedited Declaratory Ruling that a dialing system is not an automatic telephone dialing system for purposes of the Telephone Consumer Protection Act (TCPA) unless it has the capacity to dial numbers without human intervention, regardless of whether a call is initiated by entering ten digits of a telephone number or by a one-click dialing method. PACE also seeks clarification that, for TCPA purposes, a dialing system's **"capacity"** is limited to what it is capable of doing, without further modification, **at the time the call is placed**.

Ex. E at 1 (emphasis added).

Moreover, as recently as December 2, 2013, CGB stated: "Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling Filed by Glide Talk, Ltd.," a true, accurate copy of which is attached hereto as **Exhibit F**. CGB summarized Glide Talk, Ltd.'s petition as follows:

> Glide Talk states that Glide App **does not have the capacity** to generate random or sequential numbers and should not be deemed an "automatic telephone dialing system" (autodialer) under the TCPA's definition. Glide Talk asks the Commission to clarify that the TCPA's restrictions on the use of autodialers to call wireless numbers applies only to equipment that could, **at the time of the call**, be used to store or generate sequential or randomized telephone numbers.

Ex. F at 1 (emphasis added).

Plaintiff's Opposition Memorandum fails to acknowledge the clear and unambiguous

1    recent activity at the FCC pertaining to the issue at hand, which MD247 noted in its Motion.  See

2    MD247 Mot. to Stay at 6 n.1 and 10 n.5, ECF No. 50.  Moreover, on its face, the previously

3    mentioned correspondence with Congressional representatives on this issue indicates that a

4    decision is forthcoming.  This action should be stayed based upon the perceived interest

5    demonstrated by the FCC in resolving this issue once and for all.

6    **II.    THE DEFINITION OF CAPACITY IS CERTAINLY BEFORE THIS COURT AS
     PLAINTIFF MUST ULTIMATELY PROVE THAT THE PREDICTIVE DIALER USED**

7    **TO CALL HER HAD THE CAPACITY TO STORE OR GENERATE SEQUENTIAL OR
     RANDOMIZED TELEPHONE NUMBERS AND TO DIAL SUCH NUMBERS.**

8

9            Plaintiff's assertion that "the details regarding the nature of the predictive dialer used by

10   MD247 are not yet known and not before the Court," Pl. Opp'n at 7, ECF No. 57, disregards the

11   very allegations contained in Plaintiff's Complaint: "[t]he calls Plaintiff received were made

12   using equipment that had the *capacity* to store or produce telephone numbers to be called using a

13   random or sequential number generator, and to dial such numbers."  Compl. at ¶ 22, ECF No. 1

14   (emphasis added).  More to the point, among Plaintiff's alleged common questions for the Class

15   and Subclass, Plaintiff included "*whether the equipment* Defendants used to make the telephone

16   calls in question *was an automatic dialing system as contemplated by the TCPA*."  Compl. at ¶

17   28(b), ECF No. 1 (emphasis added).     MD247 denies that its equipment constitutes an ATDS.

18   Ans. at ¶ 22, ECF No. 33; see also Meehan Decl. in Supp. of Mot. to Stay at ¶¶ 4-9, ECF No.

19   51.

20           MD247 need not belabor the point, but in order to prevail under 47 U.S.C. § 227(b)(1),

21   Plaintiff must prove that MD247 utilized equipment that had the capacity to store or produce

22   telephone numbers to be called using a random or sequential number generator, and to dial those

23   numbers, when MD247 allegedly called Plaintiff on her cell phone without prior express

24   consent.  Without FCC guidance, the mixed question of law and fact regarding whether

25   MD247's equipment constituted an ATDS is certainly before this Court.

26   **III.    CONTRARY TO PLAINTIFF'S CONTENTIONS, IN ORDER TO INVOKE
     PRIMARY JURISDICTION, THE ISSUE NEED NOT BE A MATTER OF FIRST**

27   **IMPRESSION FOR THE COURT – IT MAY BE INVOKED TO PROVIDE AN
     AGENCY THE OPPORTUNITY TO ACT ON AN ISSUE WITHIN ITS SPECIAL**

28   **COMPETANCE.**

A decision by the FCC on whether businesses using equipment without the present capacity to Auto-dial should be equally as liable as those that utilize equipment with the present capacity to Auto-Dial is a decision that is rightfully regarded as one within the FCC's special competence. Though the FCC has previously concluded that a predictive dialer is an ATDS, it has not squarely addressed the meaning of the term "capacity" as used in the definition of ATDS. See generally In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,091-93 (July 3, 2003); see also Ex. C at 11.    Moreover, its prior rulings do not prevent the FCC from actively considering clarification of the definition of ATDS in the wake of the several petitions explaining the dramatic importance of such clarification.

Although Plaintiff states the obvious – that this is not an issue of first impression, Pl. Opp'n at 10-11, ECF No. 57, Plaintiff misses the mark. Staying an action pursuant to the doctrine of primary jurisdiction does not require an issue of first impression. Plaintiff cites to Clark v. Time Warner Cable for this inaccurate proposition. Pl. Opp'n at 3-4, ECF No. 57. However, the court in Clark did not limit the applicability of the doctrine to simply matters of first impression; rather the court explained,

> [I]t is to be used only if a claim "requires resolution of an issue of first impression, *or* of a particularly complicated issue that Congress has committed to a regulatory agency," and if "protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme."

Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. Cal. 2008) (internal citations omitted) (emphasis added). Moreover, as your Honor has explained, "The doctrine is applicable whenever the enforcement of a claim subject to a specific regulatory scheme requires resolution of issues that are within the special competence of an administrative body." Glauser v. Twilio, Inc., No. C 11-2584 PJH, 2012 U.S. Dist. LEXIS 9648, at *3 (N.D. Cal. Jan. 27, 2012) (ECF No. 73) (Hamilton, J.). And, lastly, "[t]he doctrine is furthermore appropriate where conduct is alleged which is 'at least arguably protected or prohibited by a regulatory statute,' and agency resolution of an issue is 'likely to be a material aid to any judicial resolution.'" Id. (citing GTE.Net LLC v. Cox Commc'ns, Inc., 185 F. Supp. 2d 1141, 1144 (S.D. Cal. 2002) (granting

1  motion to stay on primary jurisdiction grounds)).

2       Indeed, whether the *present capacity* issue is one of first impression for the court is not

3  determinative as to the appropriateness of applying the doctrine of primary jurisdiction.  MD247

4  respectfully suggests that that FCC has the requisite special competence, in light of the policy-

5  making effect that such a determination will have, to determine the definition of ATDS and

6  whether companies using equipment without the present capacity to Auto-dial are still liable for

7  use of an ATDS.  As a result, MD247 moves this Court to stay the case under the doctrine of

8  primary jurisdiction.

9    **IV.**    **WHETHER COMPANIES USING DIALERS WITHOUT THE PRESENT**
10       **CAPACITY TO AUTO-DIAL ARE AS LIABLE AS COMPANIES USING EQUIPMENT WITH THE PRESENT CAPACITY IS A POLICY-MAKING DECISION WITHIN THE SPECIAL COMPETANCE OF THE FCC AND NOT MERELY A QUESTION OF**
11       **STATUTORY INTERPRETATION.**

12       The crux of the issues raised in the aforementioned petitions is whether a machine, which

13  has been disabled in one fashion or another from storing or producing telephone numbers to be

14  called using a random or sequential number generator, and dialing such numbers, nonetheless

15  constitutes an ATDS for purposes of liability under the TCPA.

16       Although Plaintiff points out the obvious – that the petitions revolve around the meaning

17  of a single term "capacity," Pl. Opp'n at 10, ECF No. 57 – determination of the meaning of

18  "capacity" has far-reaching implications beyond statutory interpretation principles.  Perhaps, this

19  is the very reason that the FCC has taken an active interest in the matter.  By defining "capacity"

20  either broadly or narrowly, the FCC will, in effect, either sweep in a host of businesses that

21  utilize dialers that could *potentially* Auto-dial, or determine that such businesses should not be

22  held liable under the TCPA unless they do in fact have and utilize the present capacity to Auto-

23  dial at the time of calling.  Resolution of the *present capacity* issue is arguably a policy decision

24  for the FCC to make in light of its delegated authority.  See, e.g., Nat'l Cable & Telecomms.

25  Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) ("In Chevron, this Court held that . .

26  . [filling statutory gaps] involves difficult policy choices that agencies are better equipped to

27  make than courts."); see also Gentry v. Cellco P'Ship, Case No. CV 05-7888 GAF, 2006 U.S.

28  Dist. LEXIS 97876, at *16 (C.D. Cal. Mar. 21, 2006) (staying the case pursuant to the primary

1    jurisdiction doctrine and noting that the Ninth Circuit has held that "resolving statutory

2    ambiguities involves difficult policy choices that agencies are better equipped to make than

3    courts. . . . [and therefore the court] defer[s] to the Commission's reasonable, authoritative

4    interpretation." (quoting Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc., 423

5    F.3d    1056,    1070    (9th    Cir.    2005)    (internal    citations    omitted))).

6    **V.      CONCLUSION**

7           WHEREFORE, in light of the foregoing, and in light of its arguments presented in its

8    Motion and Memorandum of Points and Authorities in Support of its Motion to Stay the Action,

9    Defendant MD247.Com, Inc. respectfully requests that this Court act consistently with its ruling

10   in Glauser v.Twilio, Inc. and stay this case pending FCC resolution of the definition of the term

11   "capacity."

12   Dated: 12/18, 2013

13

14                                          By:  /s/ Brian T. Hafter
                                                 Brian T. Hafter
15                                               Stefani M. Salt
                                                 LeClairRyan LLP
16                                               44 Montgomery St., 18th Floor
                                                 San Francisco, CA  94104
17                                               (415) 391-7111, Fax (415) 391-8766
                                                 Brian.hafter@leclairryan.com
18                                               Stefani.salt@leclairryan.com

19                                               And

20
                                                 Mitchell N. Roth (pro hac vice)
21                                               Karen A. Doner (pro hac vice)
                                                 Roth Doner Jackson, PLC
22                                               8200 Greensboro Dr., Suite 820
                                                 McLean, VA  22102
23                                               Phone (703) 485-3535, Fax (703) 485-3525
                                                 mroth@rothdonerjackson.com;
24                                               kdoner@rothdonerjackson.com

25                                               *Attorneys for Defendant MD247.Com, Inc.*

26

27

28

9



**Announcing a new FCC.gov**
Tell us what you think and help shape the future »

 Federal
Communications
Commission

Search | RSS | Updates | E-Filing | Initiatives | Consumers | Find People

**Items on Circulation**

FCC > OSEC > Items on Circulation

site map

## FCC Items on Circulation

The following list of FCC Items on Circulation provides a compilation of the Commission level items that have been circulated and are pending action by the full Commission. This list is updated on a weekly basis.

**Search the FCC:**

[                    ] Go

Search Tips | Advanced

**Items on Circulation**

- **Items on Circulation** (Acrobat Format)

| Date Circulated | Bureau Office | Docket Number | Title |
|---|---|---|---|
| 12/05/2013 | EB | | Enforcement Bureau Order |
| 11/01/2013 | MB | | Sports Blackout Rules, NPRM |
| 10/24/2013 | WCB | | Connect America Fund et al. |
| 07/30/2013 | MB | | Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. MO&O |
| 05/13/2013 | CGB | | Junk Fax Prevention Act of 2005, Application for Review filed by Anda, Inc. |
| 05/13/2013 | CGB | | Communication Innovators Petition for Declaratory Ruling; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 |
| 05/13/2013 | CGB | | GroupMe, Inc./Skype Communications S.A.R.L Petition for Expedited Declaratory Ruling; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 |
| 05/13/2013 | CGB | | Cargo Airline Association Petition for Expedited Declaratory Ruling; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 |
| 11/14/2012 | MB | | Shareholders of Tribune Company, Transferors and Sam Zell, et al.; Transferees For Consent to the Transfer of Control of The Tribune Company and Applications for the Renewal of License of KTLA(TV), Los Angeles, California, et al. |

*last reviewed/updated on December 13, 2013*



EXHIBIT

A

FCC Items on Circulation

FCC Home   |   Search   |   Updates   |   E-Filing   |   Initiatives   |   For Consumers   |   Find People

Federal Communications Commission
445 12th Street SW
Washington, DC 20554
More FCC Contact Information...

Phone: 1-888-CALL-FCC (1-888-225-5322)
TTY: 1-888-TELL-FCC (1-888-835-5322)
Fax: 1-866-418-0232
E-mail: fccinfo@fcc.gov

- Privacy Policy
- Website Policies & Notices
- Required Browser Plug-ins
- Freedom of Information Act



Mignon L. Clyburn
Acting Chairwoman

**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, DC  20515

Dear Congressman Hunter:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling.  I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

**EXHIBIT**

tabbies®

B



Federal Communications Commission
Washington, D.C. 20554

September 10, 2013                    Control No. 1300619

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, D.C. 20515

Dear Congressman Hunter:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

                              Sincerely,

                              Kris Anne Monteith
                              Acting Chief
                              Consumer and Governmental Affairs Bureau



**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Scott Peters
U.S. House of Representatives
241 Rayburn House Office Building
Washington, DC 20515

Dear Congressman Peters:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling. I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

 Federal Communications Commission
Washington, D.C. 20554

Control No. 1300619

September 10, 2013

The Honorable Scott Peters
U.S. House of Representatives
2410 Rayburn House Office Building
Washington, D.C. 20515

Dear Congressman Peters:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012. The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227. In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter. We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter. Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau



Mignon L. Clyburn
Acting Chairwoman

**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, DC 20515

Dear Congressman Vargas:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling. I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

445 12th Street S.W. Washington, D.C. 20554  (202) 418-1000



Federal Communications Commission
Washington, D.C. 20554

Control No.   1300619

September 10, 2013

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, D.C. 20515

Dear Congressman Vargas:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau

**Before the**
**Federal Communications Commission**
**Washington, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Petition for Declaratory Ruling Regarding | ) | CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |

## PETITION FOR DECLARATORY RULING

Communication Innovators

David Thomas
Executive Director
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

June 7, 2012


EXHIBIT
C

## TABLE OF CONTENTS

Page

I.    SUMMARY ................................................................................................................ - 2 -

II.   THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT
      THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL
      RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY
      FOCUSED ON ABUSIVE TELEMARKETING CALLS. ....................................... - 5 -

      A.    The Text of the TCPA Autodialer Provision Excludes Predictive Dialers
            That Do Not Have the Current Ability to Generate and Dial Random or
            Sequential Numbers. ............................................................................... - 5 -

      B.    The Legislative History Confirms that the TCPA's Autodialer Provision
            Was Enacted to Curtail Unwanted *Telemarketing* Calls .......................... - 6 -

      C.    Commission Precedent Demonstrates That Predictive Dialers Should Not
            Be Subject to the TCPA's Autodialer Restriction Unless They Have the
            Current Ability to Generate and Dial Random or Sequential Numbers. ............ - 9 -

III.  THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS
      CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED
      CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS
      AND BUSINESSES ALIKE. ........................................................................ - 10 -

      A.    The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have
            Created Substantial Uncertainty for Businesses Using Predictive Dialers. ....... - 10 -

      B.    The Uncertainty from the 2003 and 2008 Decisions Has Created an Array
            of Unintended Consequences that Harm Consumers and Businesses Alike. ... - 14 -

IV.   TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD
      CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA ..... - 16 -

V.    CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE
      DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES
      WARRANT A CLARIFICATION. ................................................................. - 18 -

      A.    Today's Innovative Predictive Dialing Technology Provides Significant
            Benefits to Consumers and Businesses. ................................................ - 19 -

      B.    Many of Today's Predictive Dialers Do Not Have the Ability to Generate
            and Dial Random or Sequential Telephone Numbers. ............................ - 21 -

      C.    The Number of Wireless-Only Households Continues to Climb, Making it
            Difficult to Provide Time-Sensitive Information to a Growing Portion of
            Consumers ........................................................................................... - 22 -

VI.   CONCLUSION ...................................................................................... - 24 -

Before the
**Federal Communications Commission**
Washington, DC 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Petition for Declaratory Ruling Regarding | ) | CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |

## PETITION FOR DECLARATORY RULING

Communication Innovators ("CI"),[1] pursuant to Section 1.2 of the Federal

Communications Commission's ("Commission") rules,[2] hereby respectfully submits this Petition

for Declaratory Ruling to eliminate significant confusion regarding the applicability of the

Commission's Telephone Consumer Protection Act ("TCPA") rules[3] to "predictive dialers" used

to provide informational, non-telemarketing calls to consumers. Specifically, CI requests that

the Commission clarify, consistent with the text of the TCPA and Congressional intent, that

predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

ability to generate and dial random or sequential numbers, are not "automatic telephone dialing

systems" ("autodialers") under the TCPA[4] and the Commission's TCPA rules.

---

[1] CI is a 501(c)(4) organization that seeks to maximize the pace of telecommunications innovation and its benefit for American consumers and businesses. CI and its member technology companies strongly endorse efforts by the President, the Commission, and many in Congress to minimize the burden imposed on innovators and entrepreneurs by outdated, unnecessary, or inefficient regulations.

[2] 47 C.F.R. § 1.2.

[3] *See id.* § 64.1200.

[4] *See* 47 U.S.C. § 227.

## I.    SUMMARY

Congress enacted the TCPA specifically to curb aggressive telemarketing practices that were found to be an invasion of privacy, a risk to public safety, and that improperly shifted marketing costs to consumers.  As the Commission recognized for more than a decade, the TCPA was not intended to restrict businesses from placing informational and other non-telemarketing calls to their customers and accountholders, including on their wireless telephones. Nor did Congress intend to restrict the use of technologies such as predictive dialers – innovative equipment that dials specifically programmed contact numbers and enables company representatives to provide important, timely informational calls to consumers accurately, efficiently, and cost-effectively.[5]

In 2003, however, the Commission determined that certain predictive dialers are autodialers under the TCPA, irrespective of whether such equipment uses a statutorily required random or sequential number generator.  In finding that certain predictive dialers are autodialers, the Commission's stated concern was that the telemarketing industry had evolved to the point where calling lists of numbers using a predictive dialer was more cost-effective than calling arbitrary (*i.e.*, random or sequential) numbers, so it was necessary to take steps to prevent telemarketers from circumventing the TCPA's restrictions on automated calls.  The Commission's 2003 decision did not discuss the use of predictive dialers in non-telemarketing contexts, and it did not address whether the Commission was simply determining that devices with the unused capacity to generate and dial random or sequential numbers are autodialers under the statute, or whether it was reading the requirement of a random or sequential number

---

[5] Predictive dialers help live representatives dial telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a representative of the caller will be available to take the call.

generator out of the statutory definition altogether.  In 2008, the Commission reiterated that certain predictive dialers that did not make use of a random or sequential number generator are autodialers, but provided no additional clarity as to the rationale for including these devices. Combined, these decisions have created significant confusion for companies that use predictive dialers to place live calls for non-telemarketing purposes.[6]

Expanding the definition of autodialer to include equipment that does not have the current ability to generate and dial random or sequential numbers and is not used for telemarketing purposes would be contrary to both the text of the TCPA and Congressional intent. It would be contrary to the text because the statute requires that, to be an autodialer, equipment must have "the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator."[7]  It would be contrary to Congressional intent because non-telemarketing calls to accountholders and other consumers made using these predictive dialers do not jeopardize consumer privacy, threaten public safety, or shift marketing costs to consumers. Moreover, the Commission's current expansive interpretation – and the resulting confusion – has led to unintended consequences that harm consumers and businesses alike.  The current skyrocketing TCPA class litigation environment is also hindering innovation, diverting time and resources away from consumer-facing operations, chilling critical account communications, and creating substantial costs that inevitably are passed on to consumers.

---

[6] The Commission may issue a declaratory ruling terminating a controversy or removing uncertainty.  47 C.F.R. § 1.2.

[7] As discussed below, the confusion has also led GroupMe, Inc. to seek clarification from the Commission over the meaning of the term "capacity" in the autodialer definition.  *See infra* Section III.A.

Predictive dialer usage and technology have also changed significantly over the past decade, further warranting a declaratory ruling on this issue.[8]  Today's predictive dialers do not and cannot generate and dial random or sequential numbers, and the companies that rely on them are often not telemarketers.  Rather, the predictive dialers in use today are complex and innovative equipment and technologies used by a wide array of non-telemarketing businesses that need to connect their live representatives with consumers quickly and efficiently.  Their use benefits both consumers and businesses by, among other things, increasing productivity, performing critical regulatory compliance functions, and ensuring that consumers are not subject to improper calls.  Thus, it advances Chairman Genachowski's goal of "harnessing the power of communications technology to grow our economy, create jobs, enhance U.S. competitiveness, empower consumers, and unleash broad opportunity and a higher quality of life for all Americans."[9]

Importantly, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls or costs to consumers.  The same callers can already contact consumers on their mobile devices using manual dialing, and they have no incentive to place unnecessary informational calls.  Thus, it is only *how* some calls are made that would change, not whether the calls can be made or the number of calls that can be placed.

In addition, there has been a significant shift in consumer calling demographic patterns over the last decade due in part to a significant decrease in the cost of a wireless telephone call,

---

[8] The Commission is "especially mindful of the need to clarify [its] rules in light of technological changes."  *See, e.g.*, *Closed Captioning of Video Programming*, Declaratory Ruling, 23 FCC Rcd 16674 (2008).

[9] Remarks of FCC Chairman Julius Genachowski, Georgetown Center for Business and Public Policy, Georgetown University, Washington, DC, 1 (Nov. 7, 2011) ("Genachowski Remarks").

as approximately one-third of all households now have only wireless telephone numbers and consumers can easily "port" their wireline number to their wireless device. Now that wireless service is so inexpensive and accessible that it has replaced traditional (landline) telephone service for one-third of the U.S. population, such unnecessary restrictions on predictive dialer use are counterproductive and can prevent consumers from receiving important, time-sensitive notifications from companies that they do business with, and are thus counterproductive.

In light of these changed circumstances and the growing benefits of informational calls to wireless consumers, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, particularly when such dialers do not have the current ability to generate and dial random or sequential numbers.

## II.  THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY FOCUSED ON ABUSIVE TELEMARKETING CALLS.

### A.  The Text of the TCPA Autodialer Provision Excludes Predictive Dialers That Do Not Have the Current Ability to Generate and Dial Random or Sequential Numbers.

The TCPA and the Commission's TCPA rules define an "automatic telephone dialing system" ("autodialer") as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[10] Under this definition, the phrase "using a random or sequential number generator"

---

[10] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1).  The TCPA prohibits the use of an autodialer to place any call, absent an emergency or the prior express consent of the called party, "(i) to any emergency telephone line (including any '911' line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency); (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or (iii) to any telephone

modifies "to store or produce telephone numbers to be called." In addition, the phrase "to dial such numbers" refers to dialing numbers that have been randomly or sequentially generated. Thus, under the plain language of the TCPA, predictive dialers that do not have the *ability* to generate and dial random or sequential numbers are excluded from the definition of an autodialer.

**B.   The Legislative History Confirms that the TCPA's Autodialer Provision Was Enacted to Curtail Unwanted *Telemarketing* Calls.**

Congress enacted the TCPA in response to an increasing number of consumer complaints regarding "the use of automated equipment to engage in telemarketing."[11] The legislation was created to address the explosion of unwanted automated telephone advertising and solicitations made possible by automatic dialing machines that could generate and dial random or sequential telephone numbers and bombard parties with "computerized" solicitations.[12]

Congress recognized that, in addition to being annoying and intrusive, computerized telephone sales calls threatened public health and safety. For example, telemarketers could use autodialers to generate random or sequential telephone numbers and "dial numbers in sequence,

---

number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]" 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1).

[11] *See, e.g.*, Sen. Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969; 137 Cong. Rec. 35302 (1991) ("The compromise gives the public a fighting chance to start to curtail unwanted telemarketing practices.").

[12] *See, e.g.*, TCPA, Pub. L. No. 102-243, 105 Stat. 2394, 2395 (finding that "automated or prerecorded calls are a nuisance and an invasion of privacy"); 137 Cong. Rec. 35304 (1991) (explaining that the legislation "target[s] that abusive robotic use of [telemarketing] technology"); 137 Cong. Rec. 30818 (1991) ("[T]his legislation does not cover calls made by live persons. The intention of this bill is to deal directly with computerized calls."); 137 Cong. Rec. 18123 (1991) (stating that the bill was introduced to ban "computer voice" telemarketing calls).

thereby tying up all the lines of a business and preventing outgoing calls."[13]  Such telemarketing

activities also tied up the emergency lines of police, fire, and medical services and prevented real

emergency calls from getting through.[14]  In addition, when unwanted telemarketing calls were

placed to cell phones or paging services, they imposed costs on the called party.

     The TCPA's primary purpose was and remains protecting individuals from telemarketing

activity and ensuring the smooth transmission of emergency communications; it "targets calls

that are the source of consumer complaints – telemarketing calls placed to the home."[15]  It was

not intended to prohibit businesses from using predictive dialers to place non-telemarketing calls

that deliver account-related information to their customers and accountholders.[16]  In fact, the

legislative history recognizes that there are certain classes of helpful calls that consumers do not

mind receiving, and that Congress did not pass the legislation to prohibit, such as a bank

contacting a customer about his or her credit card.[17]  Real world examples abound where such

calls are, in fact, helpful to the average consumer:

- Data breach and identity theft notifications;
- Fraudulent activity warnings and updates;
- Parcel delivery notifications;

---

[13] *See, e.g.*, S. Rep. No. 102-178, at 1-2 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969; H.R. Rep. No. 102-317, at 10 (1991) ("Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted telephone numbers.").

[14] *See, e.g.*, 137 Cong. Rec 35303 (1991); 137 Cong. Rec. 30821 (1991).

[15] *See* 137 Cong. Rec. 18123 (1991).

[16] *See, e.g.*, 137 Cong. Rec. 35302 (1991) (describing the TCPA as allowing the FCC to exempt certain types of calls, including calls "to leave messages with consumers to call a debt collection agency to discuss their student loan . . . ."); *id.* at 35304 ("Calls informing a costumer that a bill is overdue, or a previously unstocked item is now available at a store are clearly not burdensome, and should not be prohibited.").

[17] *See* 137 Cong. Rec. 30817-18 (1991).

- Appointment reminders, including from hospitals, healthcare providers, or repair technicians;
- Calls inquiring about missed payments and advising of the prospect of interrupted service or coverage;
- Service outage or interruption reports;
- School closing announcements;
- Product recall and safety notifications; and
- Urgent employee communications.

Consistent with this approach, the Commission affirmed in the recent Robocall Report and Order that it did not want to "impede" or "unnecessarily restrict" purely informational calls when implementing the TCPA.[18]

To the extent that Congress was concerned about some non-telemarketing calls – those made through autodialers with the capacity to generate and dial random or sequential numbers – Congress was clearly focused on extensive wide-reaching "scattershot" calls, not specific and targeted calls to accountholders.  As discussed below, predictive dialers used for non-telemarketing purposes reduce the number of improper calls received by consumers and improve regulatory compliance.

Members of Congress also distinguished live calls from intrusive autodialed telemarketing calls lacking human-to-human interaction in passing the TCPA.  Representative Cooper, for example, expressed hope that "the FCC [would] regard robotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators."[19]  Predictive dialers can connect the called party to a live

---

[18] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 12-21 ¶ 21 (rel. Feb. 15, 2012) ("Robocall Report and Order").

[19] *See* 137 Cong. Rec. 35304 (1991).

person so he or she has the opportunity to speak to the person, ask questions, and address the matter at hand.[20]  This further underscores that Congress did not intend to restrict the use of predictive dialers to place non-telemarketing calls to wireless telephone numbers.

> **C.   Commission Precedent Demonstrates That Predictive Dialers Should Not Be Subject to the TCPA's Autodialer Restriction Unless They Have the Current Ability to Generate and Dial Random or Sequential Numbers.**

The Commission's original interpretation and implementation of the TCPA acknowledged that the use of predictive dialers to place non-telemarketing commercial calls should be regulated differently than unwanted, autodialed telemarketing communications made to random or sequential telephone numbers.  Specifically, in 1992, the Commission appropriately stated that certain non-telemarketing uses of predictive dialers are not intended to be prohibited by the TCPA.[21]  The Commission determined that debt collection calls, for example (which were not directed to random or sequential numbers), did not fall within the definition of autodialer.[22]  It also stated that the TCPA's overall intent was to protect consumers from unrestricted telemarketing practices,[23] so the provisions were not intended to restrict the use of predictive dialers for non-telemarketing activities.  In 1995, the Commission again confirmed that certain non-telemarketing calls are not prohibited by the TCPA's autodialer restriction because they "are

---

[20] *See id.*

[21] *See Rules and Regulations Implementing Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, 7 FCC Rcd 2736 ¶ 15 (1992) ("1992 TCPA NPRM") (discussing the use of predictive dialers in the debt collection industry and noting the benefits of increased efficiency and better communication with the called party).

[22] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 ¶ 39 (1992) (explaining that debt collection calls are not subject to the FCC's identification rules for artificial or prerecorded messages "because such calls are not autodialer calls (*i.e.,* dialed using a random or sequential number generator) . . . .").

[23] *See id.* ¶ 9.

not directed to randomly or sequentially generated telephone numbers, but instead are directed to the *specifically programmed contact numbers . . . .*"[24]

In the Robocall Report and Order, the Commission imposed new requirements on telemarketing calls but declined to do so for informational calls.  It recognized that consumers find informational calls and messages to be "highly desirable" and noted that it did not want to "discourage" the delivery of purely informational calls and messages.[25]  It also stated that it was "employ[ing] the flexibility Congress afforded to address new and existing technologies."[26]

**III.    THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS AND BUSINESSES ALIKE.**

**A.    The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have Created Substantial Uncertainty for Businesses Using Predictive Dialers.**

As discussed above, in 1992 the Commission confirmed that (1) non-telemarketing use of a predictive dialer is not intended to be prohibited by the TCPA,[27] and that (2) certain non-telemarketing calls that are not made to randomly or sequentially generated telephone numbers do not fall within the TCPA's autodialer restriction.[28]  However, in 2003, contrary to the TCPA's plain language, the legislative history, and its own precedent, the Commission ruled that some predictive dialers that do not use a random or sequential number generator are nonetheless

---

[24] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd 12391 ¶ 19 (1995) ("1995 TCPA Order") (discussing debt collection calls; emphasis added), *citing* Household International Petition for Reconsideration, CC Docket No. 92-90, at 6.

[25] Robocall Report and Order ¶ 29.

[26] *Id.*

[27] 1992 TCPA NPRM ¶ 15.

[28] *See* Section II.C., *supra*.

- 10 -

"autodialers" under the TCPA.[29]  The Commission held that "to be considered an autodialer, the equipment need only have the *capacity* to store or produce telephone numbers."[30]  The Commission was concerned that the telemarketing industry had evolved such that it was more cost-effective for telemarketers to use predictive dialers to call lists of numbers than to call random or sequential numbers.[31]  Thus, the Commission concluded that it was necessary to classify some predictive dialers as autodialers to "ensure that the prohibition on autodialed calls not be circumvented" by telemarketers who operate by automatically dialing "lists of numbers" instead of "creat[ing] and dial[ing] 10-digit numbers arbitrarily."[32]

In essence, the Commission's decision in the 2003 TCPA Order indirectly regulated the telemarketing *use* of predictive dialers by focusing on the underlying equipment *design*. However, by taking an indirect approach, and focusing only on one aspect of the equipment design (*i.e.*, a capacity to store or produce numbers rather than the capacity to generate and dial random or sequential numbers), the Commission did not address squarely whether predictive dialers that have no current "capacity" or ability to generate and dial random or sequential numbers also qualify as autodialers, particularly if such dialers are used for non-telemarketing purposes.  Nor did it explain whether such dialers raise similar concerns justifying the same treatment as predictive dialers used for telemarketing purposes.

It is not clear how this ruling squares with the statutory definition of autodialer or Congress's intent in passing the TCPA.  In the 2003 ruling, the Commission seemed to focus on

---

[29] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 ¶ 133 (2003) ("2003 TCPA Order").

[30] *Id.* ¶ 132 (emphasis in original).

[31] *Id.*

[32] *Id.* ¶ 133.

what it believed to be the equipment's potential capacity to generate and dial random or sequential numbers, noting that predictive dialing hardware "when paired with certain software, has the capacity to store or produce numbers and dial those numbers and dial those numbers at random, in sequential order, or from a database of numbers."[33]  But then the Commission described the "basic function" of autodialer equipment as being the "capacity to dial numbers *without human intervention*"[34] – a concept that appears nowhere in the statute and is very different from the ability to "store or produce telephone numbers to be called," use "a random or sequential number generator," and dial numbers that have been randomly or sequentially generated.[35]

The Commission did not explain how focusing on the ability to dial numbers without human intervention was consistent with the text of the TCPA or with Congressional intent, especially if such numbers were not randomly or sequentially generated.  Nor did it explain whether it was making a blanket rule that <u>all</u> predictive dialers and other equipment that dials numbers without human intervention fall within the statute, or whether it was simply finding that predictive dialers can be autodialers <u>if</u> they have the capacity to generate and dial random or sequential numbers.  In addition, the Commission did not explain whether calls to the "specifically programmed contact numbers" of existing customers qualified as dialing numbers "without human intervention."  This absence of clarity has generated significant confusion among businesses as to what types of predictive dialers and other equipment, if any, can be used to place non-telemarketing calls and, in particular, whether a predictive dialer that has *no ability*

---

[33] *Id.* ¶ 131.

[34] *Id.* (emphasis added).

[35] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1).

to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, falls within the statute.

In 2008, ACA International requested that the Commission clarify that a predictive dialer "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists."[36]  In response, the Commission reiterated its 2003 determinations and held that the autodialer restrictions apply when predictive dialers operate through calling lists.  However, it did not elaborate on or clarify the ambiguities created by the 2003 ruling, and thus did not answer the question of whether a predictive dialer that, without significant alteration, has *no ability* to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, is nonetheless still subject to the TCPA's restrictions on autodialers.  Thus, further clarification is warranted.

It is also unclear whether calls to "specifically programmed contact numbers" of *existing* customers (discussed above as part of the 1995 TCPA Order) are part of the "lists of numbers" mentioned in the Commission's 2003 and 2008 decisions.  Specifically, the Commission's reference to "lists of numbers" appeared to be intended to address telemarketer's use of a list of non-customer phone numbers in place of the random or sequential dialing of phone numbers.

As further evidence of the confusion created by the Commission's 2003 and 2008 decisions, GroupMe, Inc. ("GroupMe") recently filed a Petition for Expedited Declaratory Ruling and Clarification requesting that the Commission clarify and limit the scope of the term "capacity" in the autodialer definition to encompass "only equipment that, at the time of use,

---

[36] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559 (2008) ("2008 ACA Declaratory Ruling").

could, in fact, have employed the functionalities described in the TCPA without human intervention and without first being technologically altered."[37] GroupMe offers a free service that allows a group creator to define a group of individuals who may exchange non-commercial text communications (and conference calls) to individuals that comprise the group.[38]

**B.     The Uncertainty from the 2003 and 2008 Decisions Has Created an Array of Unintended Consequences that Harm Consumers and Businesses Alike.**

The Commission's 2003 and 2008 decisions regarding autodialers have led to unintended consequences that harm consumers and businesses alike, including skyrocketing class action litigation for businesses and increased costs to consumers. It also has curtailed the ability of companies to offer new products and services that consumers demand. To prevent further harm, the Commission should confirm, at a minimum, that consistent with the statutory language, companies may use predictive dialers to place non-telemarketing informational calls to wireless telephone numbers when there is no current ability or "capacity" to generate and dial random or sequential numbers.

As the Commission is aware, the penalties for TCPA violations are substantial – up to $1,500 per call. Plaintiffs' lawyers are aggressively filing larger and larger numbers of TCPA lawsuits based on alleged violations. Specifically, there has been a surge in TCPA claims and class actions in recent years involving alleged autodialer use, filed against a wide array of leading, established companies in the financial services industries and other sectors. For example, conservative estimates indicate that at least 13 TCPA class actions involving autodialers were filed in 2008, at least 36 in 2009, and at least 60 in 2010. In 2011, there were at

---

[37] *See Petition for Expedited Declaratory Ruling and Clarification*, GroupMe, Inc., CG Docket No. 02-278 (filed Mar. 1, 2012).

[38] *See id.* at 2.

least 90 TCPA class actions filed involving autodialers.[39]  Thus, TCPA class actions involving

autodialers have risen a staggering 592% in the last few years alone.  And hundreds of TCPA

cases overall (including non-class actions) have been filed since the Commission's 2008 ACA

Declaratory Ruling.[40]

 TCPA class actions are also increasingly targeting predictive dialer use in light of the

confusion created by Commission's 2003 and 2008 TCPA decisions.  As shown in the chart

below, by conservative estimates there has been an 800% increase in the number of predictive

dialer class actions filed in the last few years.[41]  And the true number of such class actions is

likely much higher.[42]



Under the current regulatory environment, almost every major financial institution using

dialing technology to accurately and efficiently call accountholders is, or soon will be, a

defendant in TCPA litigation.  And as the *Griffith* case demonstrates, the confusion and

---

[39] These statistics exclude cases focused on the TCPA's fax restrictions.  In addition, these statistics only include data from courts with records that are searchable online.  As a result, the numbers provided likely underreport the true number of TCPA class actions that have been filed.

[40] One San Diego plaintiffs' firm alone has filed at least 32 class action complaints since 2008.

[41] As with the statistics above, these statistics exclude cases focused on the TCPA's fax restrictions and only include data from courts with records that are searchable online.

[42] TCPA complaints that only reference "autodialers" have been excluded, even though they often involve the alleged use of predictive dialers.

regulatory uncertainty created by the 2003 TCPA Order potentially subjects companies to crippling liability for non-telemarketing calls, and for calls made using predictive dialer equipment that has no ability to generate and dial random or sequential numbers.[43]

The current wave of TCPA litigation harms both consumers and businesses and stifles innovation. The lawsuits divert time and resources away from consumer-facing operations and have a chilling effect on critical account communications. They also create substantial litigation costs for defendants and increase costs for companies that want to place informational calls to their own customers.[44] Unless the Commission confirms that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers, these TCPA class actions will continue to have a significant detrimental impact on consumers and businesses, even where there is no telemarketing activity involved. They will also continue to threaten jobs and the viability of entire companies, increase costs for consumers, and hinder future consumer lending and financial services efforts, all contrary to Chairman Genachowski's and the Administration's goals of promoting economic growth, innovation, competitiveness, and job creation.[45]

## IV.   TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA.

To address the confusion and remedy these problems, the Commission should issue a declaratory ruling to clarify, consistent with the text of the TCPA and Congressional intent, that predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

---

[43] *Griffith v. Consumer Portfolio Serv., Inc.*, Memorandum Opinion, Case No. 10-2697 (N.D. Ill., Aug. 16, 2011) (holding that irrespective of the statutory language, pursuant to the Commission's 2003 and 2008 decisions, predictive dialers fall within the TCPA's autodialer definition because they "have the capacity to dial numbers without human intervention").

[44] *See, e.g.*, Reply Comments of the Federal Reserve Board Staff, CG Docket No. 02-278, 4 (filed June 8, 2010).

[45] *See* Genachowski Remarks at 2.

ability to generate and dial random or sequential numbers are not "automatic telephone dialing systems" ("autodialers") under the TCPA and the Commission's TCPA rules.  In reaching this decision, the Commission should focus on the meaning of the term "capacity" in the autodialer definition and declare that, at least for informational calls, capacity refers to a present ability to generate and dial random or sequential numbers.

"Capacity" is not defined by the TCPA and thus the Commission as the expert agency can define this important term.  The Commission should clarify that the definition of an autodialer under the TCPA reflects equipment that has a *present* capacity, such as having the current ability to generate and dial random or sequential numbers without additional modifications to the equipment.  The Commission should not interpret capacity as encompassing any conceivable hardware or software modification to a device that would permit it to generate, store, and dial numbers randomly or in sequence.  For example, mobile phones, smart phones, tablets, e-readers, and personal computers can all theoretically be modified with sufficient effort and ingenuity, using various third-party software or hardware configurations, to randomly or sequentially generate and dial telephone numbers.  Such an unconstrained interpretation would make the statutory term capacity superfluous, contrary to elementary rules of statutory interpretation.

To continue protecting wireless consumers against unwanted automated telemarketing calls, the Commission can also distinguish between telemarketing and informational calls when it clarifies the meaning of capacity.  The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[46] and it could, for example, find that predictive dialers and other equipment used for *informational calls* only have

---

[46] 2003 TCPA Order ¶ 132 (internal citations omitted).

the required "capacity" to generate and dial random or sequential numbers when the capacity is actually *enabled* (*e.g.*, installed as a functioning feature on the device without requiring further modifications to the device), while also finding that the requisite "capacity" for *telemarketing calls* includes the current ability to dial numbers from a list. The Commission made a similar distinction between telemarketing and informational calls when it amended its prior express consent requirements in the Robocall Report and Order.

## V.   CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES WARRANT A CLARIFICATION.

The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[47] and the circumstances regarding predictive dialer use have changed significantly over the past decade. The growing use of predictive dialers to place telemarketing calls was a dispositive factor in the Commission's 2003 decision. However, today's predictive dialers – many of which have no current capacity to dial random or sequential numbers – are used for a number of innovative non-telemarketing purposes that simultaneously bring benefits to both consumers and businesses. There has also been a significant shift in consumer calling patterns over the last decade, resulting in approximately one-third of households now having only wireless telephone numbers. In light of these changed circumstances, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, especially if the dialers also cannot generate and dial random or sequential numbers.

---

[47] *Id.* (internal citations omitted).

A.    **Today's Innovative Predictive Dialing Technology Provides Significant Benefits to Consumers and Businesses.**

The predictive dialers in use today are a far cry from the autodialing machines that telemarketers used in the early 1990s to bombard random households with pre-recorded sales pitches.  Today's predictive dialers provide significant benefits to both consumers and businesses by allowing businesses with a legitimate need to contact a large number of specific accountholders or other consumers to do so accurately, efficiently, and cost-effectively.  They are used to place a variety of non-telemarketing calls, including informational calls to: discuss time-sensitive account transactions; provide appointment or service reminders or cancellation notifications; prevent or review fraudulent account activity or potential identity theft; confirm or arrange payments; provide data security breach notifications;[48] notify policyholders in advance of an insurance termination or lapse;[49] make calls to employees regarding workplace closures, personnel benefits, and use of annual flexible spending account funds; and discuss other legitimate account-related issues with existing customers, accountholders, and other parties with whom a caller has an existing business relationship.[50]  Today's predictive dialers also help protect consumers against improper calls.  Many states, for example, have varying laws regarding what hours it is permissible to call consumers, the number of times it is permissible to call consumers, waiting periods for contacting consumers, the circumstances under which calls must cease, and whether or when consumers can be called at work, and predictive dialers can be

---

[48] *See, e.g.*, Comments of the Financial Services Roundtable, The American Bankers Association, and The Consumers Bankers Association, CG Docket No. 02-278, 3 (filed May 21, 2010).

[49] *See id.* at 9.

[50] *See also* Robocall Report and Order ¶ 21 (stating that the Commission does not want to "unnecessarily impede" informational calls including, for example, "bank account balance, credit card fraud alert, package delivery, and school closing information").

programmed to accommodate these and other limitations.  For example, they can be programmed to restrict calls to:

- Specific telephone numbers;

- Specific individuals or accountholders;

- Certain area codes or regions;

- Certain hours of the day;

- Certain days of the week;

- A limited number of attempts or contacts per telephone number, individual, or accountholder;

- A limited number of messages left per telephone number; and

- A minimum amount of time between calls to a particular telephone number, individual, or accountholder.

Thus, predictive dialers also better protect consumer privacy and perform a critical regulatory compliance function.  Limiting companies' ability to rely on predictive dialing technology, on the other hand, means that more calls will have to be dialed manually.  As the U.S. Department of the Treasury has recognized in supporting exceptions to the autodialer restrictions, manual dialing creates a heightened risk of human error, which harms both consumers who may receive improper calls and companies that face liability for such calls under myriad statutes and regulations[51] (including, in some cases, a strict liability standard such as under the Federal Debt Collection Practices Act).  Predictive dialers also substantially increase employee productivity.

Requiring companies to contact consumers manually for informational and other non-telemarketing calls also increases communications and staffing costs, which could be particularly

---

[51] *See, e.g.*, Comments of the Financial Management Service of the Department of the Treasury, CG Docket No. 02-278, 2-3 (filed May 20, 2010) (stating that the restrictions on the use of autodialers should not apply to debt collection calls, and explaining that the use of autodialers helps collectors ensure compliance with the Fair Debt Collection Practices Act).

harmful to small businesses.  These increased costs divert critical resources away from innovative products and services.  Given how limited many companies' resources are in this economy, this diversion has a particularly severe negative impact (especially on small businesses).

In addition, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls to consumers. Callers already can contact consumers on their wireless telephone numbers using manual dialing, and they have no incentive to place unnecessary calls.  Thus, it is only *how* some calls are made that would change, not whether or how often the calls can be made.[52]

### B.   Many of Today's Predictive Dialers Do Not Have the Ability to Generate and Dial Random or Sequential Telephone Numbers.

Many of today's predictive dialers do not fall within the statutory autodialer definition because they cannot randomly or sequentially generate and dial telephone numbers.  In fact, representatives of seven leading manufacturers and marketers of predictive dialer equipment have submitted declarations stating that their respective predictive dialers:

- Do not have the capacity to store or generate telephone numbers using a random or sequential number generator;
- Have not been upgraded with separate software to provide the capacity to do so; and
- Cannot function without a list of telephone numbers provided by the user.[53]

_____

[52] To the extent that the Commission has any concerns about a ruling being inappropriately applied to provide additional flexibility for companies to place telemarketing calls, CI notes that such calls would, at a minimum, be subject to the National Do Not Call Registry.

[53] Reply Comments of ACA International, CG Docket No. 02-278, Exhibit 1 (filed June 21, 2010) ("ACA Robocall NPRM Reply Comments"); *see also* Letter from Sen. Blunt to FCC Chairman Julius Genachowski, CG Docket No. 02-278 (dated June 28, 2011) (stating that "[t]he current generation of predictive dialers does not raise concerns about calling random numbers – the practice that Congress intended to prevent when it enacted the TCPA").

Several also declared that their predictive dialer equipment is not used for telemarketing, advertisements, or solicitations.[54] And most indicated that it would require "fundamentally changing the architecture of the hardware and software" to provide even the *capacity* to randomly or sequentially generate telephone numbers using a number generator.[55] Quite simply, this is not the type of equipment that Congress sought to regulate when it enacted the TCPA, and it is not the type of equipment that is encompassed in the statutory definition of autodialer.

   **C.     The Number of Wireless-Only Households Continues to Climb, Making it Difficult to Provide Time-Sensitive Information to a Growing Portion of Consumers.**

   Another significant changed circumstance with respect to the TCPA's restriction on autodialed calls to wireless telephone numbers is the surge in the number of wireless subscribers and, in particular, the number of wireless-only households – a trend that shows no signs of slowing. When the TCPA was enacted in 1991, there were only an estimated 7 million wireless subscribers in the United States.[56] Today, there are more than 300 million wireless subscribers,[57] and almost one-third of all households <u>only</u> have wireless telephones (with that number expected to continue rising).[58] In addition, more than half of consumers aged 25-29 are living in wireless-

---

[54] ACA Robocall NPRM Reply Comments at Exhibit 1.

[55] *Id.*

[56] Prepared Testimony of Michael Altschul, General Counsel, CTIA – The Wireless Association® before the House Subcommittee on Communications & Technology regarding the Mobile Informational Call Act of 2011, 1 (Nov. 4, 2011) ("Altschul Testimony").

[57] *Id.* at 2.

[58] *See, e.g.*, CDC Study: Wireless Substitution: Early Release of Estimates From The National Health Interview Survey, July-December 2010, *available at* http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201106.htm (last accessed Oct. 18, 2011).

only households.[59]   The cost of a wireless telephone call was also ten times higher when

Congress enacted the TCPA than it is today, having dropped dramatically from approximately

44 cents per minute in 1993 to less than five cents per minute in recent years.[60]

Subjecting all calls made using predictive dialers to the autodialer restrictions thus

significantly limits the ability of companies to provide service to their customers and contact

their accountholders.  In particular, it hinders their ability to provide critical, time-sensitive

notifications regarding identity theft, fraudulent account activity, service or appointment

cancellations, or other transaction-related information.  Moreover, given that the percentage of

wireless-only households is higher among low-income groups, restricting such informational

calls could have a disproportionate negative impact on such individuals.[61]  And the fact that

consumers can now easily "port" their wireline number to their wireless device further restricts

the ability of companies to place such informational calls.  Although the Commission provides a

very limited 15-day grace period for ported numbers,[62] that period would be too short for

companies looking to place critical informational calls on even a monthly basis.

---

[59] Lance Whitney, *Over Half of Late-20s Crowd Own Cell Phones Only*, CNET (Dec. 22, 2010), *at* http://news.cnet.com/8301-1035_3-20026395-94.html.

[60] Altschul Testimony at 1, *citing Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fifteenth Report, 26 FCC Rcd 9664, Table 20 (2011) (indicating that the average revenue per minute for a wireless telephone call dropped from approximately 44 cents per minute in 1993 to five cents per minute in 2009) *and* Glen Campbell, Bank of America Merrill Lynch, 3Q Global Wireless Matrix, 2 (Sept. 28, 2011) (reporting that the average revenue per wireless minute was three cents, down from four cents at the end of 2010).

[61] *1 in 4 Homes Have Cell Phone, No Landline*, CBS NEWS (May 12, 2010), *at* http://www.cbsnews.com/stories/2010/05/12/tech/main6476743.shtml.

[62] 47 C.F.R. § 64.1200(a)(1)(iv).

Finally, the use of predictive dialers for non-telemarketing purposes creates *no* additional costs for wireless consumers because callers can already contact the same consumers on their wireless telephone numbers (through manual dialing), and they have no incentive to place unnecessary calls.  Using predictive dialers merely changes the mechanics of how those consumers are reached in a way that reduces improperly dialed calls, better protects their privacy, and promotes regulatory compliance.

## VI.   CONCLUSION

For the foregoing reasons, the Commission should clarify and confirm that predictive dialers that (1) are not used for telemarketing purposes and (2) have no current ability to generate and dial random or sequential numbers are not considered "autodialers" under the TCPA.

Respectfully submitted,

David Thomas
Executive Director
Communication Innovators
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

June 7, 2012



# PUBLIC NOTICE

**Federal Communications Commission**
445 12th St., S.W.
Washington, D.C. 20554

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

DA 13-1433
Released: June 25, 2013

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING FROM YOUMAIL, INC.

### CG Docket No. 02-278

**Comment Date: July 25, 2013**
**Reply Comment Date: August 9, 2013**

With this Public Notice, the Consumer and Governmental Affairs Bureau seeks comment on a Petition for Declaratory ruling filed by YouMail, Inc. (YouMail)[1] seeking clarification of three issues arising under the Telephone Consumer Protection Act (TCPA)[2] and Section 64.1200 of the Commission's rules.[3]

YouMail states that it provides a software-based service that allows smartphone users to replace default voicemail options with customizable telephone answering functions, including automated text message replies to calls.[4]  YouMail first asks the Commission to clarify that its "virtual receptionist" software is not an "automatic telephone dialing system" (ATDS) as defined by 47 U.S.C. § 227(a)(1)"[5] because the software does not have the current capacity to store, produce, or dial random or sequential telephone numbers but, instead, responds one time to a single input (a caller leaving a voicemail message) and only when instructed to do so by a user's settings and when adequate caller ID information is available.  Second, YouMail asks the Commission to clarify that YouMail does not initiate calls because it does not cause the call to occur as defined by the TCPA.[6]  Third, YouMail asks the Commission to confirm that callers provide prior consent to receive a responsive text when leaving voicemail messages for a

---

[1] *See YouMail, Inc.*, Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278 (filed Apr. 19, 2013) (*Petition*) (noting that several companies including YouMail are the subject of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services).

[2] Codified as 47 U.S.C. § 227.

[3] 47 C.F.R. § 64.1200.

[4] Petition at 2-3.

[5] *Id.* at 9-10.

[6] *Id.* at 12.



EXHIBIT
D

YouMail subscriber.[7]  YouMail states that these clarifications are needed to address the status of these technologies and services under the statute and implementing regulations.[8]

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[9] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[10]  Persons making *ex parte* presentations

---

[7] *Id.* at 13-14.

[8] *Id. at* 1-2.  YouMail notes that it and several other companies are the subjects of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services.  *Id.* at 8, 15.

[9] 47 C.F.R. §§ 1.415, 1.419.

[10] 47 C.F.R. §§ 1.1200 *et seq.*

must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:**  B. Lynn Follansbee, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-1514, and lynn.follansbee@fcc.gov.

**-FCC-**

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12ᵗʰ St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

DA 13-2220
Released: November 19, 2013

### CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING AND/OR EXPEDITED RULEMAKING FROM THE PROFESSIONAL ASSOCIATION FOR CUSTOMER ENGAGEMENT

**CG Docket No. 02-278**

**Comment Date: December 19, 2013**
**Reply Comment Date: January 4, 2014**

With this Public Notice, and consistent with sections 1.2(b) and 1.403 of the Commission's rules, we seek comment on the Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking filed by the Professional Association for Customer Engagement (PACE).[1]  PACE seeks clarification through an Expedited Declaratory Ruling that a dialing system is not an automatic telephone dialing system for purposes of the Telephone Consumer Protection Act (TCPA)[2] unless it has the capacity to dial numbers without human intervention, regardless of whether a call is initiated by entering ten digits of a telephone number or by a one-click dialing method.[3]  PACE also seeks clarification that, for TCPA purposes, a dialing system's "capacity" is limited to what it is capable of doing, without further modification, at the time the call is placed.[4]  PACE asserts that the Commission could provide the requested clarification in a Declaratory Ruling because no rule changes would be necessary.[5]

In the alternative, PACE requests an Expedited Rulemaking should the Commission disagree that Declaratory Ruling is appropriate.[6]  PACE requests that, in an Expedited Rulemaking, the Commission define the term "capacity" as used in the TCPA and the Commission's rules as "the current ability to

---

[1] *See Professional Association for Customer Engagement,* Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278 (filed Oct. 18, 2013) (*Petition*).  PACE is a "non-profit trade organization dedicated exclusively to the advancement of companies that utilize contact centers as an integral channel of operations." *Petition* at 4.  The Petition is styled differently on the cover page than it is within the Petition itself.  The body of the Petition, however, is clear that PACE requests an expedited a rulemaking "[i]n the alternative" to a declaratory ruling, rather than "and/or" a declaratory ruling.  *Compare Petition* at 1 *with* 3.

[2] Codified as 47 U.S.C. § 227.

[3] *Petition* at 4.

[4] *Id.*

[5] *Id.* at 12.

[6] *Id. See also* 47 C.F.R. § 1.2(a).



EXHIBIT
E
babbles

operate or perform an action, when placing a call, without first being modified or technologically altered."[7] PACE further asks that the Expedited Rulemaking modify the definition of "automatic telephone dialing system" in section 64.1200(f)(2) of the Commission's rules by adding, to the end of the definition, "without human intervention."[8]

We seek comment on PACE's *Petition*, including whether declaratory ruling or rulemaking is the appropriate type of proceeding in which to consider the merits of its arguments.

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[9] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of <u>before</u> entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD  20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC  20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[10]  Persons making *ex parte* presentations must file a

---

[7] *Petition* at 12-13.

[8] *Petition* at 13; 47 C.F.R. § 64.1200(f)(2).

[9] 47 C.F.R. §§ 1.415, 1.419.

[10] 47 C.F.R. §§ 1.1200 *et seq.*

2

copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:** Kristi Lemoine, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-2467, and kristi.lemoine@fcc.gov.

-FCC-

3



# PUBLIC NOTICE

**Federal Communications Commission**
**445 12ᵗʰ St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

DA 13-2303
Released: December 2, 2013

**CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING FILED BY GLIDE TALK, LTD.**

**CG Docket No. 02-278**

**Comment Date: January 3, 2014**
**Reply Comment Date: January 21, 2014**

On October 28, 2013, Glide Talk, Ltd. (Glide Talk) filed a petition for expedited declaratory ruling requesting that the Commission clarify certain aspects of the Telephone Consumer Protection Act (TCPA).[1] Glide Talk states that it provides a video messaging service application (Glide App) that can be used on certain mobile devices to enable communications through video messaging.[2] Glide Talk claims that, although its service does not rely on text messaging for its primary functionality, it offers its users the ability to invite other parties to install Glide App using Short Messaging Service (SMS) text messages.[3] Glide Talk indicates that the user controls these invitations and chooses the recipients of these text messages from their own contact list.[4] Glide Talk states that, as a result, Glide App merely provides a mechanism through which the user may send a text message invitation.[5]

Glide Talk states that Glide App does not have the capacity to generate random or sequential numbers and should not be deemed an "automatic telephone dialing system" (autodialer) under the TCPA's definition.[6] Glide Talk asks the Commission to clarify that the TCPA's restrictions on the use of autodialers to call wireless numbers applies only to equipment that could, at the time of the call, be used to store or generate sequential or randomized telephone numbers.[7] Glide Talk additionally argues that, even if the equipment used by the Glide App to generate text messages is characterized as autodialing

---

[1] *See Petition of Glide Talk, Ltd. for Expedited Declaratory Ruling*, CG Docket No. 02-278, filed by Glide Talk, Ltd. on Oct. 28, 2013 (Petition).

[2] *Id.* at 2-3.

[3] *Id.* at 3 (noting that "usability for any individual depends on whether the individual's friends and family members also are users of the Glide App").

[4] *Id.*

[5] *Id.* at 3-4.

[6] *Id.* at 13.

[7] *See id.* at 9-13.



EXHIBIT

F

equipment, text messages sent by the application's user are not initiated by Glide Talk and it should not be deemed the responsible party for violations of the TCPA.[8] In addition, Glide Talk contends that the Commission should confirm that the provision of a contact's phone number by a consumer constitutes prior consent to be sent a text message from the Glide App user.[9] Alternatively, Glide Talk suggests that, if the Commission declines to issue a declaratory ruling, the Commission should grant a retroactive waiver or exempt the Glide App text messages from the TCPA's rules.[10] We seek comment on the issues raised in the Petition.

By way of background, and in relevant part, the TCPA prohibits making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to any telephone number assigned to a cellular telephone service.[11] The TCPA defines an autodialer as "equipment which has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[12] In 2003, the Commission confirmed that the TCPA's prohibition on autodialers encompasses both voice and text messaging calls, including SMS calls.[13]

Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). See Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://fjallfoss.fcc.gov/ecfs2/.
- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.
- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.
- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554. The filing hours are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.

---

[8] Id. at 14.

[9] Id. at 16.

[10] Id. at 5, n.9 (contending that "[t]he Glide App's user-initiated invitation messages do not adversely affect the privacy rights of recipients because they are caused to be sent by a user to recipients with whom the user has a prior social, familial, or professional relationship").

[11] See 47 U.S.C. § 227(b)(1)(A); 47 C.F.R § 64.1200(a)(1).

[12] See 47 U.S.C. § 227(a)(1); see also 47 C.F.R. § 64.1200(f)(2).

[13] See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003).

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.
- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[14] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:** Richard D. Smith, Consumer and Governmental Affairs Bureau, Federal Communications Commission, (717) 338-2797 or Richard.Smith@fcc.gov.

-**FCC**-

---

[14] 47 C.F.R. §§ 1.1200 *et seq.*

1

## CERTIFICATE OF FILING

I hereby certify that on December 18, 2013, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send a notification of electronic filing to the following CM/ECF Participants:

| | |
|---|---|
| Sean R. Reis, Esq.<br>THE REIS LAW FIRM, A.P.C.<br>30021 Tomas Street, Suite 300<br>Rancho Santa Margarita, CA 92688<br>(949) 713-9440<br>sreis@reisfirm.com | Mitchell E. Zamoff, Esq.<br>Robert B. Hawk, Esq.<br>Stacy R. Hovan, Esq.<br>HOGAN LOVELLS US LLP<br>525 University Avenue, 4th Floor<br>Palo Alto, CA 94301<br>mitch.zamoff@hoganlovells.com<br>robert.hawk@hoganlovells.com<br>stacy.hovan@hoganlovells.com |

Jay Edelson, Esq.
Rafey S. Balabanian, Esq.
Christopher Dores. Esq.
Benjamin H. Richman, Esq.
EDELSON LLC
350 North LaSalle St., Suite 1300
Chicago, IL 60654

jedelson@edelson.com
rabalabanian@edelson.com
cdore@edelson.com
brichman@edelson.com

Stefan Coleman, Esq.
LAW OFFICES OF STEFAN COLEMAN, LLC
201 S. Biscayne Boulevard, 28th Floor
Miami, Florida 33131
Telephone: (877) 333-9427
law@stefancoleman.com

Adam K. Levin, Esq.
Carolyn Anne DeLone, Esq.
HOGAL LOVELLS US LLP
555 13th St. NW
Washington, D.C. 20004
adam.levin@hoganlovells.com

*Attorneys for Co-Defendants UnitedHealth Group, Inc., Optum, Inc. and HealthAllies, Inc.*

*Attorneys for Plaintiff and the Putative Class*

By: /s/ Brian T. Hafter
Brian T. Hafter
Stefani M. Salt
LeClairRyan LLP
44 Montgomery St., 18th Floor
San Francisco, CA 94104
(415) 391-7111, Fax (415) 391-8766
Brian.hafter@leclairryan.com